[Cite as *In re J.L.*, 2023-Ohio-1127.]

| | | |
|---|---|---|
| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
| | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF SUMMIT | ) | |

IN RE: J.L.
    C.L.
    K.L.

C.A. Nos.     30274
                30302
                30305
                30306
                30307
                30308

APPEAL FROM JUDGMENT
ENTERED IN THE
COURT OF COMMON PLEAS
COUNTY OF SUMMIT, OHIO
CASE Nos.    DN 21 09 0720
              DN 21 09 0721
              DN 21 09 0722

DECISION AND JOURNAL ENTRY

Dated: April 5, 2023

CARR, Judge.

{¶1} Appellants, D.S. ("Mother") and C.L. ("Father"), appeal from a judgment of the Summit County Court of Common Pleas, Juvenile Division, that adjudicated their three children dependent and placed them in the temporary custody of Summit County Children Services Board ("CSB"). This Court reverses and remands.

I.

{¶2} Mother and Father are the biological parents of J.L., born June 4, 2014; C.L., born May 21, 2013; and K.L., born August 31, 2017. When this case began, Mother and Father were not living together, although they had lived together in the recent past. The children resided only with Mother at that time.

{¶3}   Mother and Father apparently have a history with CSB, but that history is not explained in the record.  During late August 2021, CSB received a referral that Mother and the children were homeless and had been staying at a storage unit that Mother had rented.  CSB investigated the storage unit but found no evidence that the family had been staying there.  The intake caseworker contacted Mother, who reported that she and the children were staying with a friend at a home on Iona Avenue in Akron.  The caseworker made a few unsuccessful attempts to meet Mother at the Iona address to evaluate her housing situation.

{¶4}   On September 2, 2021, the caseworker and Mother had made an appointment to meet at the Iona address at 5:00 p.m.  While Mother was meeting her children after school at their bus stop, however, Father and the paternal grandmother ("Grandmother") unexpectedly arrived and took C.L. to Grandmother's home, against Mother's wishes.  Few details about that incident are set forth in the record, but Mother did contact the caseworker about it.

{¶5}   Mother also called the police, who eventually retrieved C.L. from Grandmother's home.  One police officer first met Mother and the other two children at a nearby convenience store and another police officer and the caseworker arrived in separate vehicles shortly afterward.  Mother briefly explained to the first police officer what had happened when Father and Grandmother left with C.L.  Mother stated that she had allowed Grandmother to speak to C.L. because she had not seen the child for a while.  Apparently before Mother realized what was happening, C.L. jumped in the car with Father and Grandmother, and they drove away with him.

{¶6}   After the second officer spoke to the caseworker about the caseworker's efforts to verify where Mother was living, the officer spoke to Mother about where she and the children had been living.  Mother told the officer that she was staying with a friend because she was "in

between" homes. She also explained to the caseworker that she was doing everything that she could to keep a safe roof over the children's heads to avoid further involvement with CSB.

{¶7} Mother purported to call the friend with whom she was living and asked the caseworker to speak to her friend. The caseworker did not speak to the person on the phone, nor did he go again to the Iona Avenue address. He told Mother that the friend could come to the team decision meeting the following day. The police removed the children pursuant to Juv.R. 6 at that time.

{¶8} The following day, CSB filed complaints, alleging that the three children were neglected and dependent. The complaints asserted that the parents were "homeless and have been for about two weeks to a month[,]" that Mother was using illegal drugs, and that both parents had a history of criminal involvement and involvement with CSB and Medina County Job and Family Services.

{¶9} The matter proceeded to a contested adjudicatory hearing. CSB did not present any evidence to support its allegations about the parents' prior agency or criminal history or that Mother was using illegal drugs. The evidence at the hearing focused almost exclusively on whether the family was "homeless" as that term is used in R.C. 2151.04(A).

{¶10} Following the hearing, the magistrate adjudicated the children dependent pursuant to R.C. 2151.04(A) and (C) and dismissed the remaining allegations in the complaint. The decision focused on the magistrate's finding that "[M]other and her three children were homeless at the time of the complaint's filing, and had had only transitory housing in the year [preceding]." The trial court adopted the magistrate's decision the same day, pending the filing of objections. The children were later placed in the temporary custody of CSB.

{¶11} Both parents filed timely, written objections to the adjudicatory decision, asserting that the agency failed to present clear and convincing evidence to support the dependency adjudication. The trial court overruled their objections, adjudicated the children dependent, and continued them in the temporary custody of CSB. Mother and Father separately appealed, and their appeals were later consolidated. Mother raises two assignments of error and Father raises one. This court will consolidate and rearrange the assigned errors to facilitate review.

II.

### MOTHER'S ASSIGNMENT OF ERROR II

THE TRIAL COURT'S DECISION FINDING THE CHILDREN DEPENDENT IS CONTRARY TO LAW, PREJUDICIAL, AND CONSTITUTES REVERSIBLE ERROR.

### FATHER'S ASSIGNMENT OF ERROR

THE TRIAL COURT ERRED BY ADJUDICATING THE MINOR CHILDREN AS DEPENDENT CHILDREN, AS THE ADJUDICATION WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶12} Mother's second assignment of error will be addressed with Father's sole assignment of error because they both contend that the evidence presented at the hearing did not support the trial court's adjudication of the children as dependent. The trial court was required to find that CSB established the adjudication of dependency by clear and convincing evidence. *In re H.P.*, 9th Dist. Summit Nos. 29973 and 29975, 2022-Ohio-778, ¶ 28, citing *In re I.K.-W.*, 9th Dist. Summit No. 29100, 2019-Ohio-2807, ¶ 17; R.C. 2151.35(A)(1); and Juv.R. 29(E)(4). Clear and convincing evidence is that which will "produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established." *In re Adoption of Holcomb*, 18 Ohio St.3d 361, 368 (1985), quoting *Cross v. Ledford*, 161 Ohio St. 469 (1954), paragraph three of the syllabus.

{¶13} When reviewing whether an adjudication of dependency is against the manifest weight of the evidence:

> this court [reviews] the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the [trier of fact] clearly lost its way and created such a manifest miscarriage of justice that the [adjudication] must be reversed[.]"

*In re G.G.*, 9th Dist. Summit No. 29952, 2022-Ohio-1654, ¶ 19. The trial court adjudicated the children dependent under R.C. 2151.04(A) and (C), which alternatively define a dependent child as one:

> (A) Who is homeless or destitute or without adequate parental care, through no fault of the child's parents, guardian, or custodian; [OR]
>
> (C) Whose condition or environment is such as to warrant the state, in the interests of the child, in assuming the child's guardianship[.]

{¶14} The trial court focused its adjudication on a finding that the children were "homeless" under R.C. 2151.04(A). It also found that the children were dependent under R.C. 2151.04(C) because of their homelessness and because Father's behavior had resulted in a "volatile environment" for them. This Court will begin by addressing the trial court's finding that the children were homeless.

### "Homeless" under R.C. 2151.04(A)

{¶15} The evidence in this case relevant to the family's alleged homelessness is undisputed. CSB had received a referral that Mother and the children had been sleeping in a storage unit, but the agency's investigation failed to reveal any evidence that they had, in fact, been staying there. Mother reported to the caseworker that she and the children were staying at the home of Mother's friend who lived on Iona Avenue in Akron. Although the caseworker made a few attempts to meet Mother at the Iona address, he had been unsuccessful. Once, he came

unannounced and two other times he had made appointments, but Mother was delayed and called him to reschedule the appointments.

{¶16} The parties disputed whether CSB should have made additional attempts to investigate the Iona address. Because CSB had not inspected the home, however, it presented no evidence to dispute Mother's claims that she and the children were staying there, nor did it offer evidence that the home was not an appropriate place for the children to reside. Instead, the primary issue at the hearing was whether the children were "homeless" under R.C. 2151.04(A) because they did not have a permanent residence.

{¶17} The testimony of the intake caseworker primarily focused on the family's lack of a permanent home. He testified that Mother "said they were staying [at the Iona address,] but they had also been couch surfing." He did not ask, nor did Mother explain, what she meant when she used the term couch surfing. The caseworker further testified that, at the team decision meeting, Mother "stated she was currently homeless," but she immediately qualified that statement by explaining "that she had been staying with a friend, but it was nothing permanent." Mother further told him that she and the children had been staying at the Iona address for "three to four weeks." Mother told him that, prior to staying at the Iona address, she and the children had resided in the home of another friend, also for "three or four weeks."

{¶18} The trial court also heard the testimony of one of the police officers who responded to the convenience store on September 2, which resulted in the Juv.R. 6 removal of the children. The officer testified about her conversations with Mother and excerpts of her body camera video were admitted into evidence. Regarding CSB's allegations that the children were homeless, this evidence merely supported the other evidence that Mother admitted that she had no permanent place to live but she and the children had been staying temporarily with a friend. Mother told the

caseworker that she had been making every effort not to stay at inappropriate places and had been trying to keep a safe roof over her children's heads.

{¶19} This Court cannot agree with the trial court that the children were "homeless" under R.C. 2151.04(A) solely because they did not have a permanent residence. The term "homeless" is not defined in R.C. Chapter 2151 or any relevant provisions of the Ohio Administrative Code. Although this Court has reviewed appeals from dependency and neglect cases involving concerns about a family being homeless, those cases typically involved other threats to the safety and well-being of the children, such as their exposure to domestic violence, drug use, or behavioral threats caused by their parents' unstable mental health. *See*, *e.g*., *In re A.L.*, 9th Dist. Summit Nos. 28345 and 28347, 2016-Ohio-8504, ¶ 3; *In re P.C.*, 9th Dist. Summit Nos. 21734 and 21739, 2004-Ohio-1230, ¶ 2.

{¶20} In *In re R.L.*, 9th Dist. Summit No. 28387, 2017-Ohio-4271, this Court affirmed an adjudication based solely on the child being homeless. In that case, the issue of the child's homelessness was clear: the mother was being evicted from her home and had made no alternative living arrangements for the child, so she could not meet the child's basic need for adequate shelter. *Id*. at ¶ 17. A child who is lacking any place to reside is necessarily "homeless," so there was no need for this Court to further define the term in that case. *See id*.

{¶21} In this case, this Court must delve deeper into the meaning of the term "homeless" as it is used in R.C. 2151.04(A). The adjudication of the children in this case hinges on whether they were "homeless" at the time CSB filed its complaint, not because they had no place to stay, but because they had no permanent residence.

{¶22} To support its argument that these children were "homeless" because they lacked a permanent home, CSB relies on Ohio Adm.Code 122:6-1-01(I) and 42 U.S.C. 11302(a)(1), which

define homeless to include temporary residences or the lack of a "regular and adequate nighttime residence" or a "fixed, regular, and adequate nighttime residence." Although those definitions place some emphasis on something more permanent than temporary housing, they also explicitly focus on the *adequacy* of one's nighttime residence. In fact, 42 U.S.C. 11302(a) includes six distinct definitions of the term "homeless," which range from a lack of a fixed, regular, and adequate nighttime residence to a nighttime residence that is not intended for human sleeping accommodations, such as a car, a park, or an abandoned building. 42 U.S.C. 11302(a)(1)-(6). Several definitions focus more on the safety and adequacy for human occupation than on the stability and permanence of the dwelling. *See id.*

{¶23} Moreover, Ohio Adm.Code 122:6-1-01(I) and 42 U.S.C. 11302 explicitly apply to the housing situations of people seeking to qualify for government housing assistance. These provisions focus on addressing the crisis in lack of housing availability and helping people improve their situations by finding more stable housing. *See* 42 U.S.C. 11301 (explaining the purpose of the federal housing assistance). The question here is not whether Mother and her children could qualify for, or benefit from, government assistance to improve their housing situation.

{¶24} Instead, the focus of this dependency adjudication is necessarily on whether the children's overnight housing arrangement was so inadequate that it justified the state in removing the children from Mother's custody, to protect their safety and well-being. R.C. 2151.01(A) requires that the language of R.C. 2151.04 (and other provisions in R.C. Chapter 2151) be liberally construed so as "[t]o provide for the care [and] protection" of children, but "separating the child[ren] from [their] parents only when necessary for the child[ren]'s welfare or in the interests of public safety[.]"

{¶25} The definition of "homeless" in this situation must necessarily focus on whether the children's basic needs were being met. Although the Ohio Supreme Court has not explicitly defined the term "homeless" for purposes of a dependency adjudication, it has emphasized that R.C. 2151.04(A) "focuses exclusively on the child's situation to determine whether the child is without proper (or adequate) care or support." *In re Riddle*, 79 Ohio St.3d 259, 262 (1997). R.C. 2151.011(B)(1) defines adequate parental care as "the provision by a child's parent or parents * * * of adequate food, clothing, and shelter to ensure the child's health and physical safety[.]"

{¶26} There was no evidence in this case that the children's overnight shelter at the Iona address was unsafe or inadequate, or that their basic needs were not being met. The caseworker conceded that, aside from their lack of a permanent home, the children appeared to be otherwise well-adjusted, clean, nourished, and appropriately cared for. In fact, although the family had moved between temporary residences, CSB had verified that Mother had kept the children enrolled in the same schools, and they were attending school regularly.

{¶27} The police officer's body camera video further depicted the two younger children, who were clean and well dressed. They ate ice cream and sat calmly and affectionately with Mother while she spoke to the police and the caseworker outside the convenience store. Although Mother appeared upset because the police were removing her children, she remained cooperative and did not exhibit any volatile, irrational, or erratic behavior in response to her conversations with the police or the caseworker.

{¶28} Given that CSB presented no evidence to establish that the children were not residing at the Iona address or that it was not an otherwise appropriate place for the children to reside, CSB's evidence that the children were "homeless" relied solely on evidence that they

lacked a permanent residence. This Court cannot agree that such a definition of "homeless" comports with the purposes of the dependency statute, R.C. 2151.04(A).

### Other Evidence

In its judgment overruling the parents' objections and adjudicating the children dependent, the trial court also focused on two additional facts, which it concluded had demonstrated that the children's condition or environment warranted state intervention: (1) approximately one week before CSB filed the complaint, Father left a profanity-laced message on the caseworker's voice mail; and (2) Father and Grandmother had taken C.L., against Mother's wishes and in violation of a protection order between Father and Grandmother. A finding of dependency under R.C. 2151.04(C), based on a parent's conduct, requires a demonstration that the parent's conduct forms a part of the child's environment and has a detrimental impact on the child. *In re A.C.*, 9th Dist. Wayne Nos. 03CA0053, 03CA0054, and 03CA0055, 2004-Ohio-3248, ¶ 14, citing *In re Burrell*, 58 Ohio St.2d 37, 39 (1979). "That impact cannot be simply inferred in general, but must be specifically demonstrated in a clear and convincing manner." *Id*.

{¶29} These two incidents were explained in minimal detail at the adjudicatory hearing and there was no evidence that either of these incidents had any detrimental impact on the children. The caseworker testified about a profanity-laced voicemail message that Father left him, but there was no evidence to suggest that the children heard the message or were aware of it. It involved a lot of swearing and disrespect toward the caseworker, but it did not involve any threats against the caseworker or the children, nor was there any evidence that Father had sworn at or behaved erratically around the children.

{¶30} There are also few details about the incident during which Father and Grandmother took C.L. and went to Grandmother's house, except that Mother and Grandmother both contacted

the caseworker and Mother called the police. A police officer testified at the hearing and body camera video was shown, both of which revealed only what happened after the police came to meet Mother at the convenience store. There was no evidence that any harsh words were exchanged, that violence erupted, or anything about what the children experienced when Father and Grandmother took C.L. Mother contacted the caseworker and the police, who later retrieved C.L. from Grandmother's home. There was no evidence to suggest that Mother did anything inappropriate when Father and Grandmother took C.L. or that the children suffered any ill effects from that incident.

{¶31} This Court can only conclude that CSB failed to prove, by clear and convincing evidence, that the children were "homeless" under R.C. 2151.04(A) or that their "condition or environment" warranted the state in assuming their guardianship under R.C. 2151.04(C). The trial court lost its way in concluding otherwise. *See In re G.G.*, 2022-Ohio-1654, at ¶ 19. Consequently, the trial court should have sustained the parents' objections to the adjudicatory decision and dismissed CSB's complaint. Father's sole assignment of error and Mother's second assignment of error are sustained.

## MOTHER'S ASSIGNMENT OF ERROR I

THE TRIAL COURT'S FAILURE TO MAKE A REASONABLE EFFORTS DETERMINATION IN VIOLATION OF R.C. 2151.419(A)(1) CONSTITUTES PREJUDICIAL AND REVERSIBLE ERROR AS A MATTER OF LAW[.]

Mother also argues that the trial court erred by failing to make reasonable efforts findings. Because this Court reverses the adjudication of these children, and resulting disposition, this assignment of error has been rendered moot and will not be addressed. *See* App.R. 12(A)(1)(c).

III.

{¶32} Father's sole assignment of error and Mother's second assignment of error are sustained. Mother's first assignment of error is not addressed because it has been rendered moot by this Court's disposition of the remaining assignments of error. The judgment of the Summit County Court of Common Pleas, Juvenile Division, is reversed and remanded for proceedings consistent with this opinion.

Judgment reversed and
cause remanded.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellee.

DONNA J. CARR
FOR THE COURT

SUTTON, J.
FLAGG LANZINGER, J.
CONCUR.


APPEARANCES:

PAUL GRANT, Attorney at Law, for Appellant.

ALAN M. MEDVICK, Attorney at Law, for Appellant.

SHERRI BEVAN WALSH, Prosecuting Attorney, and HEAVEN R. DIMARTINO, Assistant Prosecuting Attorney, for Appellee.

NEIL P. AGARWAL, Guardian ad Litem.